OPINION. Van Fossan, Judge: The petitioners’ contention on the major issue is essentially that the declaration of trust made by John R. MacManus on May 9,1934, constituted a new and separate document wholly independent of the original trusts executed by the decedent in 1923 and of the amendments thereto made in 1924. In support thereof, the executors argue that the provisions of the declaration of trust differ materially from those in the original trusts, as amended, and in some respects are in direct conflict with them. They then conclude that the intent of the decedent, acquiesced in by the trustee and the beneficiaries, was obivously to wipe out the original trusts, together with the powers reserved to the decedent which might carry through and thus control subsequent trusts, and to establish an entirely new agreement eliminating all interest, rights, and powers of the decedent in the trust corpus held by John R. MacManus. Under facts practically identical with those now before us, this precise question was considered by the Circuit Court of Appeals for the Sixth Circuit in MacManus v. Commissioner, 131 Fed. (2d) 670, reversing the decision of the Board of Tax Appeals at 44 B. T. A. 508. The issue in that case, involving income taxes, was whether the petitioner, John R. MacManus, was a trustee in four separate trusts or in a single trust with multiple beneficiaries. There the court, for whose opinions we have great respect, held that there were four independent trusts; that the declaration of trust made by John R. MacManus was consonant with the intent of the decedent to reshape or remold the original trusts; and that the decedent was still the grantor of the trust estate, regardless of the form that the reshaping or remolding took. The court there said: * * * Early in 1934 the grantor, being dissatisfied with the handling of the estates by the trustee, desired to terminate or reconstitute the trusts and to rehabilitate the assets. The carrying out of his purpose was preceded by family conferences and resulted in the transfer of the assets of all four trusts to the petitioner who executed a declaration of trust wherein he acknowledged holding the corpus as trustee for his two sisters, his brother, and himself, share and share alike. It is with the interpretation of this instrument that the controversy mainly is concerned. Prior to its execution, however, Theodore F. MacManus on April 20, 1934, wrote to the petitioner advising him of his intention and purpose is reconstituting the trusts. Since the Board found the petitioner’s declaration ambiguous and resort to extrinsic aids to its interpretation necessary,. the precise terms of this communication likewise become important * * *. [The communication is the letter from the decedent to his son appearing in our findings of fact.] The court stated that Theodore F. MacManus was dead and that “it is his intention that is conceded to be controlling.” The court then said: Assuming ambiguity, we turn to a consideration of the grantor’s letter to his son John. It indicates his sole purpose to be a change of trustee because of his dissatisfaction with the results obtained by the Trust Company. He is advised that the simplest way of relieving the Trust Company is to change the beneficiary provision from Theodora, Alice and Teddy, to John, who would then act as sole trustee. Then to avoid any misunderstanding or confusion, he says, “I want to impress upon you most earnestly, however, that the original spirit behind the creation of the trust(s) is not changed. Our distinct and definite understanding is that the four trusts are to remain intact and that your own, Theodora’s, Alice’s and Teddy’s positions will be exactly the same.” Had he stopped there, no contention could reasonably have been made that it was his purpose to convert the separate trusts into one. The final sentence of the letter, however, says. “The details and mechanics of the matter I leave to you in consultation with Mr. Hammel and Mr. Sloan”. It is upon this grant of authority that the Board relies in concluding that the “administration” (book treatment) of the estate was in consonance with the grantor’s intention. The court proceeded to discuss the effect of the use of the singular and plural reference to the trusts as affecting the problem immediately under its consideration and added: It thus will be seen that in the declaration of the trustee there is a clear recognition of the purpose of Theodore F. MacManus to continue the existing trusts with but one change, and that in the name of the trustee, and that the predominant thought throughout the instrument is that there are four trusts and not one. * * * Thus the controversy basic to the issue here has beep, decided by the Circuit Court of Appeals. The decedent remained the grantor of the trusts set up by his son on May 9,1934, and the rights, powers, and interest reserved to him in the original trusts were retained by him until his death. The petitioners point out many provisions contained in the declaration of trust inconsistent with those appearing in the trusts of 1923 and the amendments of 1924. No extended discussion of such differences is required. The latter conditions may be considered as modifications or amendments of the original documents. The petitioners further argue that the use of the word “terminate” in the declaration of trust and in the record, together with the decedent’s disavowal of any “interest” therein, served to eliminate entirely the original trusts and paved the way for the creation of four new and complete trusts. We do not so construe the record, nor did the Circuit Court of Appeals. The words “continue” and “rehabilitate” were also used in the declaration of trust and the word “reconstitute” in the opinion of the court. It is clear to us, as it was to the Circuit Court of Appeals, that it was not the decedent’s intention to obliterate the original trusts, but to carry them on through the new instrument executed by his son, with the Detroit Trust Co. ejected as trustee. The decedent’s alleged disclaimer of any “interest” in the May 9, 1934, trust, as shown in his letters to the insurance companies, may well apply to pecuniary interest and not to the rights and powers reserved to him. To a layman, the entire gamut of his potential legal rights under the trust agreements would not be constantly before him. His disclaimer must be viewed in the light of all the facts. Therefore, the retention of the right and power of the decedent to designate the beneficiaries of the trust brings the case at bar precisely within the language of section 811 (c) of the Internal Eevenue Code[1] and renders the trust corpus subject to the estate tax. The respondent argues also that the decedent relinquished the enjoyment of the trust corpus in contemplation of death. In view of our decision just made, we need not discuss this phase of the issue. It now becomes necessary to consider the proper value of the annuity contracts at the date of the decedent’s death. The respondent contends that the basis of value is governed by Regulations 105, section 81.10 (i) (2), which provides that “the value of an annuity contract issued by a company regularly engaged in the selling of contracts of that character is established through the sale by that company of comparable contracts,” and that the unpaid original cost is the proper value. The petitioners maintain that the commuted or discounted value of the contract is the proper basis. Upon the death of Theodore F. MacManus there became due and payable so much of the annuity contracts as remained unpaid, or $237,804.06, as stipulated. The respondent claims that this amount is the correct value of the contracts which fell into the decedent’s estate. However, the contracts provided that the amount so unpaid should be repaid in annual installments of a stated amount, without interest. The proceeds of'the contracts, therefore, to be paid by the company constituted its obligation to pay the stipulated sum, not in a lump sum, but in installments extending over a period of years. This is not the type of “annuity” contract contemplated by Regulations 105, section 81.10 (i) (2).[2] No evidence was offered to show that any of the companies named in the record was regularly engaged in the sale of annuity contracts or would have sold a “contract” comparable to their obligations at the date of the decedent’s death. Hence, there is named no price at which such contracts would have been sold. The respondent has not followed his own regulation in supporting his determination of value. The petitioners have demonstrated clearly that the simple obligation of the company to pay to the decedent’s estate the remaining unre-paid amount of the contract ($237,804.06) in installments over a period of years without interest is not equivalent to an obligation to pay the full amount of such unrepaid portion of the contract upon the decedent’s death. Therefore, it is obvious that the value of such an obligation at the decedent’s death was not the full amount of the unpaid original cost, but was that cost, reduced appropriately to account for the use of the money by the company without interest until all contractual installments should have been paid. We can not assume that the company would have sold, or the estate would have purchased, such a contract at the figure indicated by the respondent. If it be argued that the principle set forth in United States v. Ryerson, 312 U. S. 260; Guggenheim v. Rasquin, 312 U. S. 254; and Powers v. Commissioner, 312 U. S. 259, is applicable here, it need only be pointed out that those cases involved the correct value of single pre-minm life insurance policies assigned as gifts. The Court held that the cash surrender value was not the proper criterion for valuation, since cash surrender value represents only one of the several rights held by the owner of the policy, but that cost is a cogent evidence of value and was the only suggested criterion reflecting the value to the owner of his entire bundle of rights in a single premium insurance policy. The case at bar presents no question of life insurance, but only a simple evaluation of the right of the estate to receive, at the date of the decedent’s death, the annual installments during the term of years established in the contract. The company had the option to pay the full amount of annual installments upon the decedent’s death, but at a discounted or commuted value of such deferred payments. Since the commuted or discounted value of the obligation of the company to pay in installments the amount due at the annuitant’s death has been stipulated to be $191,113.34, we believe that sum to be the proper measure of the value of the contracts, and we so hold. Reviewed by the Court. Decision will be entered wider Ride 60. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or Intangible, wherever situated, except real property situated outside of the United States— [[Image here]] (c) Tbansfibs in Coktimplatioh or, ob Takisq Btfict at Dbatb. — To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death <1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money’s worth. * » * The value of an annuity contract issued by a company regularly engaged in the selling of contracts of that character is established through the sale by that company of comparable contracts.